UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————————x

IRONWORKERS LOCAL 580 – JOINT FUNDS;
IRONWORKERS LOCALS 40, 361 & 417 – UNION
SECURITY FUNDS; IRONWORKERS LOCAL 40
BUILDING AND GENERAL FUNDS; and BONNIE
STEWART, individually and on behalf of all others
similarly situated,

        Plaintiffs,

     -against-

LINN ENERGY, LLC, LINNCO, LLC; MARK E.
ELLIS; KOLJA ROCKOV; DAVID B. ROTTINO;
MICHAEL C. LINN; JOSEPH P. MCCOY;
GEORGE A. ALCORN; DAVID D. DUNLAP;
JEFFREY C. SWOVELAND; TERRENCE S.
JACOBS; BARCLAYS CAPITAL INC.;
CITIGROUP GLOBAL MARKETS INC.; RBC
CAPITAL MARKETS, LLC; WELLS FARGO
SECURITIES, LLC; MERRILL LYNCH, PIERCE,
FENNER & SMITH INCORPORATED; CREDIT
SUISSE SECURITIES (USA) LLC; RAYMOND
JAMES & ASSOCIATES, INC.; UBS SECURITIES
LLC; GOLDMAN, SACHS & CO.; J.P. MORGAN
SECURITIES LLC; ROBERT W. BAIRD & CO.
INCORPORATED; BMO CAPITAL MARKETS
CORP.; CREDIT AGRICOLE SECURITIES (USA)
INC.; CIBC WORLD MARKETS CORP.; HOWARD
WEIL INCORPORATED; and MITSUBISHI UFJ
SECURITIES (USA), INC.,

        Defendants.

————————————————————————————x

No. 13 Civ. 4875 (CM)

## MEMORANDUM DECISION AND ORDER
## GRANTING DEFENDANTS' MOTIONS TO DISMISS

McMahon, J.:

    A putative class of shareholders of LINN Energy, LLC ("LINN") and LinnCo, LLC

("LinnCo") brings this action against LINN, LinnCo, the underwriters of LinnCo's initial public

offering, and several LINN/LinnCo officers and directors (collectively, "Defendants"), for claims arising under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k, 77l, and 77o; Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a); and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5.

Defendants move to dismiss all claims pursuant to Rules 8(a), 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure, and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). For the reasons set forth below, the Defendants' motions to dismiss are GRANTED.

## BACKGROUND[1]

### I.      The Parties

Defendant LINN Energy, LLC ("LINN") is a publicly-traded energy company that acquires and develops oil and natural gas properties in the onshore United States. It is structured as a limited liability company and is treated as a partnership for federal tax purposes. LINN "units" are listed and traded on the National Association of Securities Dealers Automated Quotation ("NASDAQ") stock exchange.

LINN stated in its SEC filings that the company's "primary goal is to provide stability and growth of distributions for the long-term benefit of its unitholders." Compl. at ¶ 6 (quoting 2012 10-K[2] at 2). "Distributions" are periodic cash payments, similar to dividends, that LINN makes to unitholders. According to Plaintiffs, LINN's distributions are a key focus of its

---

[1] The facts are taken from the Consolidated Amended Class Action Complaint ("Complaint"), documents incorporated therein, and publicly-filed SEC documents.

[2] Form 10-K (or "10-K") is an annual report that is filed with the SEC. Unless otherwise specified, any citation to an SEC filing refers to a filing by LINN.

investors. The Complaint alleges that "LINN's units attract investors seeking yield-based investments, as the Company's LLC agreement requires that it make quarterly distributions of all 'available cash' to unitholders, as that term is defined by the agreement." *Id.*

Defendant LinnCo, LLC ("LinnCo") is a separate publicly-traded entity that owns LINN units as its sole asset; LinnCo has no significant assets or operations other than its ownership of LINN units. LinnCo completed its initial public offering ("IPO") on October 12, 2012. It is treated as a corporation for federal tax purposes. Buying shares in LinnCo allows investors who prefer a corporate tax structure to own an indirect interest in LINN and to benefit from LINN's quarterly distributions, which they receive as dividends from LinnCo. Like LINN units, LinnCo shares are listed and traded on NASDAQ. *See id.* at ¶ 4.

Plaintiffs assert that, "[b]ecause [LinnCo]'s sole asset is LINN units, [LinnCo]'s success depends entirely on the operation and management of LINN, and [LinnCo]'s ability to pay dividends to its shareholders depends entirely on LINN's ability to make distributions to its unitholders." *Id.* at ¶ 5. Indeed, LinnCo's offering documents and its quarterly and annual SEC filings have incorporated LINN's SEC filings by reference and included them as exhibits. *See id.*

Defendants Mark E. Ellis, Kolja Rockov, David B. Rottino, Michael C. Linn, Joseph P. McCoy, George A. Alcorn, David D. Dunlap, Jeffrey C. Swoveland, and Terrence S. Jacobs (collectively, the "Individual Defendants") are officers and directors of LINN and/or LinnCo. *See id.* at ¶¶ 28-37.

Defendants Barclays Capital Inc., Citigroup Global Markets Inc., RBC Capital Markets, LLC, Wells Fargo Securities, LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Credit Suisse Securities (USA) LLC, Raymond James & Associates, Inc., UBS Securities LLC,

3

Goldman, Sachs & Co., J.P. Morgan Securities LLC, Robert W. Baird & Co. Incorporated, BMO Capital Markets Corp., Crédit Agricole Securities (USA) Inc., CIBC World Markets Corp., Howard Weil Incorporated (n/k/a Scotia Capital (USA) Inc.) and Mitsubishi UFJ Securities (USA), Inc. (collectively, the "Underwriter Defendants") are financial services firms that acted as underwriters in connection with LinnCo's IPO on October 12, 2012. *See id.* at ¶¶ 41-61.

Plaintiffs Ironworkers Local 580 – Joint Funds, Ironworkers Locals 40, 361 & 417 – Union Security Funds, and Ironworkers Local 40 Building and General Funds are shareholders of LinnCo. Bonnie Stewart is a unitholder of LINN. In accordance with the PSLRA, the Court appointed them as lead plaintiffs at a hearing on October 4, 2013. *See id.* at ¶¶ 24-25.

Plaintiffs seek to represent a class consisting of all persons who (1) "purchased or otherwise acquired LINN units during the LINN Class Period" (defined as February 25, 2010 through September 17, 2013), (2) "purchased or otherwise acquired LNCO common shares pursuant or traceable to [LinnCo's] IPO Registration Statement and Prospectus issued in connection with [LinnCo's] IPO on or around October 12, 2012, and/or purchased [LinnCo] common shares in the IPO directly from one of the Underwriter Defendants or were successfully solicited by Defendants for their own financial gain," and (3) "purchased or otherwise acquired [LinnCo] common shares during the LNCO Class Period" (defined as October 12, 2012 through September 17, 2013). *Id.* at ¶ 266.

Plaintiffs refer to the "LINN Class Period" and the "LNCO Class Period" (which is a subset of the LINN Class Period) collectively—*i.e.*, February 25, 2010 through September 17, 2013—as the "Class Period." *Id.* at ¶ 1. Plaintiffs purchased LINN units and LinnCo shares during the Class Period. Plaintiffs' claims under the Exchange Act relate to the entire Class

4

Period; their claims under the Securities Act only relate to the period beginning after LinnCo's IPO (the "LNCO Class Period"). *See id.*

## II. The Alleged Misstatements and Omissions

Like all publicly-traded companies, LINN prepares its financial statements in accordance with Generally Accepted Accounting Principles ("GAAP"). *See* 2009 10-K at 59. LINN's quarterly and annual financial statements include the traditional balance sheet, income, and cash flow statements. As permitted by SEC regulations, LINN also discloses "non-GAAP" metrics— *i.e.*, metrics for which there is no uniform definition under GAAP rules—because LINN believes that these metrics are useful for investors. *See* SEC Release No. 33-8176, "Conditions for Use of Non-GAAP Financial Measures," 2003 WL 161117, at *1 (January 22, 2003).

Plaintiffs assert that certain non-GAAP metrics disclosed by LINN were materially misleading because they failed to account for the costs associated with purchasing derivative instruments called "put options." *See* Compl. at ¶¶ 8, 15, 93.

To mitigate (or "hedge") its exposure to fluctuating oil and gas prices, LINN enters into various derivative contracts that allow it to lock in a fixed or guaranteed minimum price for its production. As LINN disclosed in its 2009 10-K (which it filed at the beginning of the Class Period on February 25, 2010), these transactions are primarily in the form of "swap" contracts, "collars," and "put options." A "swap" contract specifies a fixed price that LINN will receive from the counterparty (as compared to floating market prices); on the settlement date LINN either receives or pays the difference between the swap price and the market price. A "collar" specifies the range of prices that LINN will receive (as compared to floating market prices); on the settlement date LINN has the opportunity to receive up to the price ceiling while being

5

protected against downside risk below the price floor. There are no upfront costs associated with entering into contracts for swaps or collars. *See* 2009 10-K at 61-62.

In contrast, a "put option" requires LINN to pay the counterparty an upfront fee called a "premium" at the time of purchase. In exchange, LINN obtains the right (but not the obligation) to sell its commodities at a guaranteed minimum price (the "strike price") during the life of a multi-year contract. Put options protect LINN from the risk that the prices of the commodities it sells will plummet, while allowing LINN to maintain upside opportunity in case the market price rises above the strike price. The premium that LINN pays for a put option is equal to the fair market value of the option on the purchase date. After purchase, LINN owes no further amounts under the put option contracts. As LINN explained in its 2009 10-K, LINN "receive[s] from the counterparty the excess, if any, of the fixed price floor over the market price [of the underlying commodity] at the settlement date." 2009 10-K at 62. Where the market price of the commodity has fallen far below LINN's strike price, the company realizes a significant gain upon settlement of the put option. Accordingly, the value of a put option is generally inversely proportionate to the value of the underlying commodity. *See* Compl. at ¶ 7.

Because put options offer both downside protection and upside opportunity, the upfront costs associated with purchasing put options can be substantial. In the Complaint, Plaintiffs allege that LINN's non-GAAP disclosures throughout the Class Period were materially misleading because LINN failed to disclose that it did not deduct the cost of the premiums paid for settled put options in calculating three non-GAAP metrics: (1) adjusted EBITDA, (2) distributable cash flow ("DCF"), and (3) the distribution coverage ratio. *See id.* at ¶ 9. Adjusted EBITDA is the "starting point" for calculating both DCF and the distribution coverage ratio. *Id.* at ¶ 11. The exact formulas for these non-GAAP figures are discussed in detail below.

6

Plaintiffs further allege that LINN understated its maintenance capital expenditures ("maintenance capex"), a figure subtracted from adjusted EBITDA in calculating DCF. Plaintiffs contend that, because maintenance capex was understated, LINN's DCF was overstated.

Plaintiffs assert that these misstatements and omissions were material because LINN "measured its success based on cash distribution coverage ratios and distributable cash flows." *Id.* at ¶ 13. Further, investors and financial analysts used the DCF and distribution coverage ratio metrics as proxies for determining how much LINN would pay in cash distributions to unitholders. Plaintiffs contend that, by overstating DCF, LINN "presented investors with a materially inflated view of the Company's cash flows available for distribution and, as a result, its ability to continue to sustain or grow its cash distributions." *Id.* at ¶ 9.

## III.   LINN's Disclosures

### A.   GAAP Disclosures

LINN's non-GAAP metrics are derived from its GAAP metrics. So in order to evaluate the completeness of LINN's non-GAAP disclosures, one must start by examining LINN's GAAP disclosures.

LINN's use of derivative instruments is reflected on its GAAP-compliant balance sheet, income statement, and cash flow statement. It is also discussed in the notes accompanying LINN's financial statements.

Since the beginning of the Class Period, LINN has expressly disclosed that it treats derivative instruments (including put options) as assets or liabilities. LINN's 2009 10-K described LINN's three primary types of derivatives (swaps, collars, and put options) and then stated: "Derivative instruments . . . are recorded at fair value and included on the consolidated

7

balance sheets as assets or liabilities." 2009 10-K at 62. LINN's balance sheet lists "derivative instruments" as a line item under "Assets." *Id.* at 69.

Because LINN treats derivatives as assets—which by definition have lasting value—it capitalizes and amortizes the costs associated with purchasing put options (*i.e.*, the premiums) and incrementally expenses them on its income statement over time. "Capitalization" is the process of charging an expenditure to an asset account (as opposed to an expense account) because the expenditure yields benefits for a period in excess of one year. *See* JOEL G. SIEGEL, DICTIONARY OF ACCOUNTING TERMS 65 (3rd ed. 2000) (hereafter "Siegel").

Once LINN charges the put option premiums to an asset account, it amortizes those costs. "Amortization" is a concept similar to depreciation; it means that, for accounting purposes, a company spreads the costs associated with an intangible asset over its expected useful life, instead of expensing the full cost on its income statement immediately upon purchase. In other words, the company deducts a portion of the costs associated with an asset each year until the asset no longer has value—in this case, when the derivative contract expires. *See id.* at 23. Amortizing the cost of an asset better matches the expense (amortization) with the extended time period in which the asset may contribute to revenue—a central goal of income statements.[3] In contrast, where a company purchases an item that does not have value beyond the current period,

---

[3] Income statements are prepared in accordance with the "accrual basis" method of accounting. Under the accrual method, revenue is recognized when earned and expenses are reported when incurred. *See* Siegel at 12. Under the "matching principle," expenses are reported "on a cause-effect basis against the reported revenue it relates to." *Id.* at 277. In other words, an income statement reflects expenses that are associated with the revenues earned during that period. Accordingly, when a company purchases an asset with a useful life of several years (*e.g.*, a put option with a fixed five-year term), it makes sense to expense the cost of that asset incrementally over the years in which it may generate revenue. For example, for a put option that has a five-year life, the company may deduct exactly one fifth of the cost of the option each year for five years. This gradual deduction of the cost of the asset on the income statement is called amortization. Amortization does not perfectly match the revenue from the put option with the associated expense, since in reality the put option will produce all its revenue at once (*i.e.*, at the time of settlement). But *ex ante*, this accounting method better matches the expense with the associated revenue by spreading the cost over the various years in which the option *may* contribute to revenue.

8

it expenses the full cost of that item in the period incurred, because that is the only period in which the item contributes to revenue generation.

LINN's income statement reflects its amortization of derivative costs (including premiums paid to purchase put options) in the expense line item called "depreciation, depletion and amortization." 2009 10-K at 70.

Income statements include both "cash" items and "noncash" items. Amortization is a "noncash" expense, which means that it does not reflect an actual cash outlay during the period in which it is reported. *See* Siegel at 296. After LINN makes an initial cash payment to purchase a put option, it expenses a portion of that premium each year for several years through amortization. Accordingly, while LINN's amortization for derivatives is reported as an expense on its income statement in a particular year, LINN does not pay out that amount in cash for derivatives during the reporting period; LINN paid for the derivatives in some previous period. This is the nature of "noncash" expenses like amortization—they do not reflect a cash payment during the period in which they are reported.

Plaintiffs do not allege that LINN's treatment of derivatives as assets or its capitalization and amortization of derivative costs were inappropriate under GAAP. In fact, a financial news article quoted in the Complaint states: "Linn expenses the cost of puts and other derivatives over a multiyear period when calculating net income, *as mandated by accounting rules*." Compl. at ¶ 197 (quoting Andrew Bary, *Drilling Into the Numbers*, BARRON'S, February 16, 2013, http://online.barrons.com/article/SB50001424052748704852604578298253512225108) (emphasis added).

In addition to contributing to LINN's amortization expense, derivatives affect LINN's income statement through the revenue line item called "gain (loss) on oil and natural gas

9

derivatives." 2009 10-K at 70. The notes to LINN's 2009 income statement explain that this line item has two components—"unrealized" gains and "realized" gains. *Id.* at 93.

As LINN disclosed, "Unrealized gains (losses) represent the change in fair value of the derivative instruments and are noncash items." *Id.* Once a derivative is recorded on LINN's balance sheet at its initial "fair value," the company adjusts the value of that asset on its balance sheet each period to reflect its fair market value—a process called "mark-to-market" accounting, which is proper under GAAP. LINN explained that it "determines the fair value of its derivative financial instruments utilizing pricing models for significantly similar instruments." *Id.* at 62. Mark-to-market accounting better represents the current market value of the assets on a company's balance sheet than does their historical date-of-purchase cost.

Once LINN adjusts the value of its derivatives on its balance sheet, it must record that adjustment (*i.e.*, the unrealized gain/loss on derivatives) on its income statement. If the estimated market value of LINN's derivatives goes up from one period to the next, the company records the "gain" as revenue on its income statement; if the market value goes down, the company records the "loss" as a reduction to revenue (effectively, an expense). These gains/losses are "unrealized" because LINN has not actually sold or disposed of the asset to which they relate; LINN continues to hold the derivative contract. *See* Siegel at 461. These unrealized gains/losses are also "noncash" because no money actually changes hands when LINN marks the assets to market and records the change in value on its income statement.

In its 2009 10-K, LINN explained its unrealized loss on derivatives for that year as follows:

> Unrealized gains and losses result from changes in market
> valuations of derivatives as future commodity price expectations
> change compared to the contract prices on the derivatives. During
> 2009, expected future oil and natural gas prices increased, which

10

> resulted in unrealized losses on derivatives of approximately
> $591.4 million for the year ended December 31, 2009.

2009 10-K at 41. Though LINN recorded a $591.4 million unrealized loss on its derivatives, it

did not actually pay out that amount in cash during 2009; this was a noncash item included on

the income statement as a component of the revenue line item "gain (loss) on oil and natural gas

derivatives."

The other component of LINN's "gain (loss) on oil and natural gas derivatives" is

"realized" gains. In its 2009 10-K, LINN explained that "[r]ealized gains (losses) . . . represent

amounts related to the *settlement* of derivative instruments." *Id.* at 93 (emphasis added). So

realized gains represent the money that actually changes hands at the time that derivative

contracts are settled. The only "amounts related to the settlement of" put options are cash

inflows (*i.e.*, revenues) since, as LINN explained, the company never has to pay the counterparty

at the time of settlement; rather, the counterparty pays LINN the "excess, if any, of the fixed

price floor over the market price [of the underlying commodity] at the settlement date." *Id.* at

62. In contrast, LINN has to make cash outlays upon settlement of swap contracts if the swap

price is lower than the commodity's market price.

In its 2009 10-K, LINN described its realized gain on derivatives for that year as follows:

"During the year ended December 31, 2009, the Company had commodity derivative contracts

for approximately 113% of its natural gas production and 80% of its oil and NGL [natural gas

liquid] production, which resulted in realized gains of approximately $450.0 million . . ." *Id.* at

41.

Because in 2009 LINN had a realized gain on derivatives of $450 million and an

unrealized loss on derivatives of $591.4 million, LINN reported a combined "gain (loss) on oil

and natural gas derivatives" of negative $141.4 million on its income statement—it lost money

11

"on paper," but only because unrealized (or mark-to-market) losses exceeded realized gains (cash dollars received).

Thus, LINN's GAAP-compliant income statement includes three items related to derivatives: (1) amortization of derivative costs as an expense (a noncash item), (2) unrealized gains/losses on derivatives as a revenue item (a noncash item), and (3) realized gains/losses on derivatives as a revenue item (a cash item). All these items enter into the calculation of LINN's "income (loss) from continuing operations" (a profitability measure) and the income statement's bottom line—"net income." *Id.* at 70.[4] On its 2009 income statement, LINN reported a net loss of approximately $298 million. *See id.*

Finally, LINN's use of derivative instruments is reflected on its cash flow statement. While an income statement summarizes a company's performance in a particular period by measuring the profitability of its operations (by matching revenues with their associated expenses), the cash flow statement summarizes the cash that actually flowed in and out of the company during the period. There is no "accrual" and no effort to "match" cash inflows with related cash outflows from other periods.[5] The cash flow statement has three different sections: operating activities, investing activities, and financing activities.

The "cash flow from operating activities" section of LINN's cash flow statement starts with LINN's net income (as calculated on the income statement) and then makes several adjustments to net income in its calculation of a figure called "net cash provided by (used in)

---

[4] The only difference between "income from continuing operations" and "net income" is the "income from discontinued operations"—a figure that is generally quite minimal. In 2009, LINN reported a loss from discontinued operations of approximately $2.2 million. *See* 2009 10-K at 70. So income from continuing operations includes the effects of nearly all the revenue and expense items that are included in the calculation of net income.

[5] Cash flow statements are prepared in accordance with the "cash basis" (as opposed to the accrual basis) method of accounting. Under the cash basis, revenues are recognized when cash is received (as opposed to earned), and expenses are reported when cash is disbursed (as opposed to when expenses are incurred). *See* Siegel at 67.

12

operating activities." *Id.* at 72. These adjustments include two noncash items related to

derivatives: "depreciation, amortization and depletion" and "mark-to-market on derivatives"

(*i.e.*, unrealized gain/loss on derivatives). The adjustments reverse the effects that those noncash

items had on net income, since the items do not reflect actual cash inflows or outflows during the

period. In the case of "depreciation, amortization and depletion," that item was a noncash

deduction on the income statement; so LINN adds that item back to net income in calculating net

cash provided by operating activities. In the case of "mark-to-market on derivatives," LINN

adds back any unrealized loss on derivatives that was deducted on the income statement, or

subtracts any unrealized gain on derivatives that was added on the income statement. These

adjustments eliminate the effects of noncash items and enable LINN to calculate how much cash

it truly generated from operations (*i.e.*, net cash provided by operating activities) during the

period.

In addition, the operating activities section of LINN's cash flow statement includes a

deduction called "premiums paid for derivatives." *Id.* In other words, LINN deducts the cash

actually paid to purchase put options during the period (not the money previously paid for

options that happened to settle during the period) in calculating net cash provided by operating

activities. Plaintiffs acknowledge that, under GAAP rules, it was appropriate to record on the

cash flow statement only the upfront costs associated with put options that were purchased

during the period. *See* Pl. Opp. to LINN[6] at 2-3. This is so because a cash flow statement

reflects the money that actually changes hands during a period. Accordingly, in calculating net

cash provided by operating activities, LINN does not deduct premiums paid in previous periods

---

[6] "Pl. Opp. to LINN" refers to the Plaintiffs' opposition to the motion to dismiss filed by the "LINN Defendants" (*i.e.*, all Defendants other than the Underwriter Defendants). *See* Docket No. 44.

for put options—even if those put options settled during the period and generated cash inflows—because premiums paid in the past have no cash impact during the period at issue.

On its 2009 cash flow statement, LINN deducted "premiums paid for derivatives" in the amount of $93.6 million.  2009 10-K at 72.  A footnote to net cash provided by operating activities stated: "The years ended December 31, 2009, December 31, 2008, and December 31, 2007, include premiums paid for derivatives of approximately $93.6 million, $129.5 million and $279.3 million, respectively." *Id.* at 51.  LINN further explained:

> Premiums paid during 2009, 2008 and 2007 . . . were for commodity derivative contracts that hedge *future production.* These derivative contracts provide the Company long-term cash flow predictability to manage its business, service debt and pay distributions and are primarily funded through the Company's Credit Facility. The amount of derivative contracts the Company enters into in the future will be directly related to expected future production.

*Id.* (emphasis added).  Thus, LINN's cash flow statement makes clear that the "premiums paid for derivatives" are for derivative contracts that it entered into during the reporting period; these contracts will be settled in future periods.

On its 2009 cash flow statement, LINN reported "net cash provided by operating activities" in the amount of approximately $427 million.  *See id.* at 72.  This figure is markedly different from LINN's 2009 net loss of $298 million, as reported on the income statement, but that is because LINN's net loss included the effects of noncash items.

To summarize, the costs associated with put options are treated quite differently on LINN's cash flow statement and its income statement.  Because "net cash provided by operating activities" only reflects actual cash inflows and outflows during the period, LINN's cash flow statement includes a deduction for the premiums paid to purchase put options during the period; it does not deduct any premiums that were paid to purchase put options in previous periods, even

14

if those options settled during the period. In contrast, because "net income" reflects the

profitability of LINN's operations, the company's income statement approximately matches

expenses paid in previous periods with the revenues or losses they subsequently generate.

Accordingly, LINN amortizes the cost of a put option; it deducts that cost incrementally over the

useful life of the option. So the amortization deduction on the income statement does include a

portion of the premiums paid to purchase put options in previous periods, some of which

correspond to the options that actually settle (and produce revenue) during the period.

LINN's cash flow statement makes the differences between "net income" and "net cash

provided by operating activities" clear by providing a reconciliation between the two measures.

*See id.*

The other financial statements that LINN filed during the Class Period (*i.e.*, its Form 10-

Ks and 10-Qs[7]) contain similar disclosures regarding LINN's GAAP treatment of derivatives.

*See* 2010 10-K at 45, 47, 52, 62, 69-72; 2011 10-K at 71-74, 78, 95; 2012 10-K at 62, 69-72; 1Q

2013[8] 10-Q at 1-4, 11, 23; 2Q 2013 10-Q at 1-4, 11.

Again, Plaintiffs do not challenge the appropriateness of LINN's accounting treatment of

derivatives under GAAP or the completeness of its disclosures relating to GAAP metrics. They

challenge only LINN's non-GAAP disclosures.

## B.     Non-GAAP Disclosures

In its financial disclosures, LINN used several non-GAAP metrics, which are metrics that

are "calculated and presented on the basis of methodologies other than in accordance with"

GAAP. SEC Release No. 33-8176, 2003 WL 161117, at *1. In other words, there is no uniform

---

[7] Form 10-Q (or "10-Q") is a quarterly financial report that is filed with the SEC.

[8] This opinion uses shorthand designations for each quarter in which LINN released financial statements.
I refer to the first quarter of 2013 as "1Q 2013," the fourth quarter of 2009 as "4Q 2009," and so on.

15

GAAP rule governing how these metrics are calculated.  These metrics included: (1) adjusted EBITDA, (2) DCF, (3) the distribution coverage ratio, and (4) maintenance capex.

### 1.  Adjusted EBITDA

In the Complaint, Plaintiffs allege that LINN failed to properly account for the cost of the premiums paid for settled put options in calculating adjusted EBITDA, DCF, and the distribution coverage ratio.  As LINN's disclosures make clear (and as Plaintiffs acknowledge), both DCF and the distribution coverage ratio are derived from adjusted EBITDA.

"EBITDA" is an acronym for a common financial metric—"earnings before interest, taxes, depreciation, and amortization."  Compl. at ¶ 65.  In other words, EBITDA is net income with the deductions for interest, taxes, depreciation, and amortization added back in.  As one might expect, adjusted EBITDA is EBITDA with a few other adjustments.

In its 2009 10-K, LINN described adjusted EBITDA as "a non-GAAP financial measure[] used by management to analyze Company performance."  2009 10-K at 35.  It further stated:

> Adjusted EBITDA is a measure used by Company management to evaluate cash flow and the Company's ability to sustain or increase distributions. The most significant reconciling items between net income (loss) and adjusted EBITDA are interest expense and noncash items, including the change in fair value of derivatives and depreciation, depletion and amortization.

*Id.*  LINN then expressly defined "adjusted EBITDA" as income from continuing operations plus the following cash and noncash items:

- Net operating cash flow from acquisitions and divestitures, effective date through closing date;
- Interest expense;
- Depreciation, depletion and *amortization*;
- Impairment of goodwill and long-lived assets;

- Write-off of deferred financing fees and other;
- (Gain) loss on sale of assets, net;
- *Unrealized (gain) loss on commodity derivatives;*
- Unrealized (gain) loss on interest rate derivatives;
- Realized (gain) loss on interest rate derivatives;
- Realized (gain) loss on canceled derivatives;
- Unit-based compensation expenses;
- Exploration costs; and
- Income tax (benefit) expense.

*Id.* at 56 (emphasis added).

LINN clearly disclosed that the effects of the two derivative-related noncash items on the income statement that are included in income from continuing operations (amortization expense and the unrealized loss/gain on derivatives) are eliminated in calculating adjusted EBITDA—the noncash expenses are added back and the noncash revenues are subtracted. However, the derivation of adjusted EBITDA did not eliminate the realized gains on derivatives; that cash item is incorporated into the calculation of adjusted EBITDA.

Notably, these adjustments mean that adjusted EBITDA does not incorporate a deduction for the amortization of premiums paid for put options in prior years. It makes perfect sense that adjusted EBITDA did not include such a deduction; the acronym EBITDA stands for "earnings before interest, taxes, depreciation, and *amortization*." Compl. at ¶ 65 (emphasis added).

LINN then set forth a schedule reconciling adjusted EBITDA with the GAAP measure from which it is derived—income from continuing operations. The schedule starts with income from continuing operations and then adds each of the adjusting line items to ultimately reach adjusted EBITDA. *See* 2009 10-K at 57.

A note to this reconciliation schedule explained how to reconcile adjusted EBITDA with another GAAP measure—net cash provided by operating activities:

> Net cash provided by operating activities for the year ended December 31, 2009, was approximately $426.8 million and

> includes cash interest payments of approximately $73.9 million, premiums paid for commodity derivatives of approximately $93.6 million, cash settlements on interest rate derivatives of approximately $41.7 million, realized gains on canceled derivatives of approximately $(49.0) million and other items of approximately $(20.8) million that are not included in adjusted EBITDA.

*Id.* So LINN explained as clearly as it is possible to do the differences between adjusted EBITDA and two different GAAP metrics—one that measures profitability (income from continuing operations) and one that measures cash flow (net cash provided by operating activities).

Significantly, the note to the reconciliation schedule also made clear that "premiums paid for commodity derivatives" are "included" in the calculation of net cash provided by operating activities (*i.e.*, deducted on the cash flow statement), but they "are not included in adjusted EBITDA." *Id.* In other words, LINN disclosed that the calculation of adjusted EBITDA does not incorporate a deduction for the premiums paid to purchase put options during the period. Plaintiffs do not contest this fact. *See* Pl. Opp. to Underwriters[9] at 2.

Because, as Plaintiffs put it, adjusted EBITDA was the "starting point" for calculating both DCF and the distribution coverage ratio, Compl. at ¶ 11, LINN's disclosures regarding the adjusted EBITDA calculation were crucial to understanding DCF and the distribution coverage ratio.

Further, LINN cautioned investors that adjusted EBITDA "should not be considered in isolation" but instead "should be considered in conjunction with income from continuing operations and other performance measures prepared in accordance with GAAP, such as operating income or cash flow from operating activities." 2009 10-K at 56. So the company

---

[9] "Pl. Opp. to Underwriters" refers to the Plaintiffs' opposition to the motion to dismiss filed by the Underwriter Defendants. *See* Docket No. 43.

alerted investors to the limitations of non-GAAP metrics like adjusted EBITDA. LINN also

pointed out that, because adjusted EBITDA is a non-GAAP measure, adjusted EBITDA "as

defined by [LINN], may not be comparable to similarly titled measures used by other

companies." *Id.*

LINN made similar disclosures regarding adjusted EBITDA throughout the Class Period.

*See* 2010 10-K at 56-58; 2011 10-K at 58-59; 2012 10-K at 57-58; 1Q 2013 10-Q at 29-30. In

later quarters, LINN's financials started reconciling adjusted EBITDA with net income instead

of with income from continuing operations. *See* Compl. at ¶¶ 85-86; 2012 10-K at 57-58; 1Q

2013 10-Q at 29-30; 2Q 2013 10-Q at 42. This was a minor change, since net income and

income from continuing operations are closely related figures—the only difference is the income

from discontinued operations. In any event, when the change was made it was fully disclosed

and apparent from the face of the financial statements.

The Complaint alleges that LINN's financial statements were misleading in that they

failed to disclose that adjusted EBITDA excluded the cost of settled put options. *See* Compl. at

¶¶ 93, 196. Plaintiffs abandon this argument in their Opposition (indeed, they call it an

"illusory" theory of liability that was invented by the Defendants, although it was not). *See* Pl.

Opp. to LINN at 2, 13. Instead, Plaintiffs focus their briefs on their assertions that LINN's

reported DCF and distribution coverage ratio—both of which are derived from adjusted

EBITDA—were false and misleading.

### 2. Distributable Cash Flow

As Plaintiffs acknowledge in the Complaint, LINN disclosed how it calculated DCF

(another non-GAAP metric). *See* Compl. at ¶ 88. In fact, LINN revealed its formula for DCF in

the Form 8-K[10] it released on the first day of the Class Period (February 25, 2010, the same day

that LINN filed its 2009 10-K): DCF = Adjusted EBITDA – Interest expense – Maintenance

capital expenditures. *See* 2/25/2010 8-K Ex. 99 at 14. Nowhere in this formula is there any

suggestion that premiums paid for derivatives that settled during the period are deducted from

adjusted EBITDA when calculating DCF. Neither are LINN's "cash reserves" part of the DCF

formula.

LINN's DCF is not the same thing as the distribution it actually pays to unitholders.

LINN's Board of Directors ("Board") declares the distribution each quarter based on the

requirement that the company distribute all "available cash." LINN disclosed that "available

cash" is not the same thing as DCF; it is defined in the LLC agreement as:

> [A]ll cash on hand at the end of the quarter *less the amount of cash
> reserves established by the Board of Directors* to:
>
> provide for the proper conduct of business (including reserves for
> future capital expenditures, future debt service requirements, and
> for anticipated credit needs); and
>
> comply with applicable laws, debt instruments or other
> agreements;
>
> plus all cash on hand on the date of determination of available cash
> for the quarter resulting from working capital borrowings made
> after the end of the quarter for which the determination is being
> made.

2009 10-K at 29 (emphasis added); *see also* 2010 10-K at 31; 2011 10-K at 31; 2012 10-K at 29.

Thus, LINN's Board has some discretion over the amount of any quarter's distribution; it may, if

it chooses, set aside some of the company's cash on hand as "cash reserves" to "provide for the

proper conduct of business" and to satisfy other obligations. *Id.*

---

[10] Form 8-K (or "8-K") is an SEC filing used to notify investors of a material event. LINN releases a
companion 8-K with every 10-K or 10-Q that it files.

By contrast, DCF is "a supplemental financial measure used by Company management in determining (prior to the establishment of any reserves by its Board of Directors) the amount of cash available for distribution to the Company's unitholders." 2Q 2013 10-Q at 41.

Plaintiffs allege that LINN held an earnings call[11] on February 25, 2010 in which Defendant Rockov (LINN's Chief Financial Officer) stated that LINN was "going to have a lot of excess cash flow going forward." Compl. at ¶ 101. He allegedly "touted" the company's 4Q 2009 distribution per unit ($0.63) and DCF per unit ($0.66). *Id.* at ¶ 100. LINN's 4Q 2009 8-K[12] also included a projected distribution per unit of $0.63 for 1Q 2010, and a projected DCF per unit of $0.67. *See* 2/25/2010 8-K Ex. 99 at 14.

LINN made similar disclosures regarding DCF and distributions in financial releases, earnings calls, and presentations throughout the Class Period. *See* Compl. at ¶¶ 132, 141, 152, 160, 168, 177, 184, 193, 205, 219; 4/29/2010 8-K Ex. 99 at 13; 7/29/2010 8-K Ex. 99 at 12; 8/2/2012 S-1/A[13] at 114; 9/25/2012 S-1/A at 116; 10/1/2012 S-1/A at 116; 5/3/2013 S-4/A[14] at 269; 2Q 2013 10-Q at 41-42, 44; 9/17/2013 S-4/A at 298. In each instance, LINN disclosed that there was a slight difference between DCF and the amount that would actually be distributed to shareholders.

In the "Risk Factors" section of its 2009 10-K, LINN also noted the "many risks" inherent in its business, including the risk that it "may not have sufficient cash flow from operations to pay the quarterly distribution at the current distribution level, or at all, and future

---

[11] An "earnings call" is a conference call or webcast during which a company's officers discuss its quarterly and annual financial results with investors and financial analysts.
[12] "4Q 2009 8-K" refers to the 8-K that disclosed LINN's 4Q 2009 financial results and was released as a companion to LINN's 2009 10-K.
[13] Form S-1/A (or "S-1/A") is an amendment to Form S-1 (or "S-1"), an SEC filing used to register securities.
[14] Form S-4/A (or "S-4/A") is an amendment to Form S-4 (or "S-4"), an SEC filing used to register securities in connection with business combinations and exchange offers.

distributions to [its] unitholders may fluctuate from quarter to quarter." 2009 10-K at 13-14.

LINN went on to explain:

> The amount of cash we can distribute on our units principally
> depends upon the amount of cash we generate from our operations,
> which will fluctuate from quarter to quarter based on, among other
> things:
>
> - produced volumes of oil, natural gas and NGL;
> - prices at which oil, natural gas and NGL production is sold;
> - level of our operating costs;
> - payment of interest, which depends on the amount of our
>   indebtedness and the interest payable thereon; and
> - level of our capital expenditures.

*Id.* at 14. So LINN expressly warned investors that many factors could inhibit its ability to

continue to pay distributions at all, or at any given level, in the future. LINN repeated these risk

disclosures in subsequent filings during the Class Period. *See* 2010 10-K at 15; 2011 10-K at 16;

2012 10-K at 15.

Despite its disclaimers, LINN paid quarterly distributions of between $0.60 and $0.75 per

unit throughout the Class Period. Plaintiffs do not allege that LINN drastically reduced or

eliminated the distributions it actually paid to unitholders. Rather, they allege that the DCF

metric was overstated because it failed to "properly" account for the costs of settled put options,

and that this overstatement misled investors about LINN's ability to make future distributions at

historical levels. *See* Compl. at ¶¶ 93, 196, 220.


### 3. Distribution Coverage Ratio

On the first day of the Class Period, LINN also disclosed the formula it used to calculate

something called the "distribution coverage ratio." After deriving DCF from adjusted EBITDA,

LINN calculated its distribution coverage ratio as follows: Distribution coverage ratio = DCF per

unit / distributions per unit. *See* 2/25/2010 8-K Ex. 99 at 14. Plaintiffs recognize that this is the

formula for calculating LINN's distribution coverage ratio. *See* Compl. at ¶¶ 75, 88.

The distribution coverage ratio "compares total distributable cash flow to the quantity

paid out to shareholders." *Id.* at ¶ 75. Thus, Plaintiffs assert, the ratio "is important because it

reflects the cushion LINN has to pay its distributions. A coverage ratio below 1.0 indicates that

a company is not generating adequate cash to cover its distributions." *Id.*

LINN's 4Q 2009 8-K disclosed that the company had a distribution coverage ratio of

1.14 for 2009, meaning that its DCF was equal to 114% of its distributions. *See* 2/25/2010 8-K

Ex. 99 at 1.

LINN also disclosed that its distribution coverage ratio for 4Q 2009 alone was 1.04.

Plaintiffs allege that, in LINN's February 25, 2010 earnings call, Defendant Rockov explained

that the 1.04 distribution coverage ratio for 4Q 2009 was calculated by "compar[ing]" LINN's

DCF per unit of $0.66 to its distribution per unit of $0.63. Compl. at ¶ 100.

The 4Q 2009 8-K also included a projected distribution coverage ratio of 1.06 for 1Q

2010; this ratio was calculated using the same formula. *See* 2/25/2010 8-K Ex. 99 at 14.

LINN made similar disclosures regarding the distribution coverage ratio in financial

releases, earnings calls, and presentations throughout the Class Period. *See* Compl. at ¶¶ 132,

141, 152, 160, 168, 177, 184, 193, 205, 219; 4/29/2010 8-K Ex. 99 at 13; 7/29/2010 8-K Ex. 99

at 12; 8/2/2012 S-1/A at 114; 9/25/2012 S-1/A at 116; 10/1/2012 S-1/A at 116; 5/3/2013 S-4/A at

269; 9/17/2013 S-4/A at 298.

Plaintiffs allege that, as with DCF, LINN overstated the distribution coverage ratio by

failing "properly" to deduct the cost of settled put options in its DCF calculation. *See* Compl. at

¶¶ 93, 196, 220.  Essentially, Plaintiffs claim that LINN's mistaken calculation of DCF tainted its calculation of the distribution coverage ratio as well.

### 4. Maintenance Capital Expenditures

Finally, Plaintiffs allege that LINN "understated" its maintenance capex.  Compl. at ¶ 93. As discussed above, from the beginning of the Class Period, LINN disclosed that maintenance capex was one of the items deducted from adjusted EBITDA when calculating DCF.  LINN's 4Q 2009 8-K provided more detail about the capital expenditures that were categorized as "maintenance" expenditures.

On the first page of the 4Q 2009 8-K, LINN included a "2010 Capital Budget and Operational Overview:"

> LINN's 2010 capital budget of $155 million has two distinct components: low-risk, low-cost maintenance activities and drilling high rate-of-return wells, including the horizontal Granite Wash program. *Maintenance activity will primarily focus on workover, recompletion and optimization projects* and is a continuation of a very successful 2009 program.  The Company plans to drill more than 80 wells and complete more than 400 workovers and recompletions during 2010.

2/25/2010 8-K Ex. 99 at 1 (emphasis added).  The glossary in LINN's 2009 10-K defined "recompletion" as the "completion for production of an existing wellbore in another formation from that which the well has been previously completed," and defined "workover" as "[m]aintenance on a producing well to restore or increase production."  2009 10-K at iii, iv. LINN's 2009 10-K also described "optimization projects" as projects that "replace production." *Id.* at 2.

LINN's disclosure statements explained that the "maintenance capital expenditures" deducted in its DCF calculation were part of its "capital budget" (*i.e.*, capital expenditures), and

that these capital expenditures were used to upgrade existing facilities in order to restore or

improve production—"workover, recompletion and optimization projects." 2/25/2010 8-K Ex.

99 at 1.

Plaintiffs allege that Defendant Ellis (LINN's Chief Executive Officer) discussed LINN's

maintenance capex in response to an analyst question during its 2Q 2011 earnings call on July

28, 2011. *See* Compl. at ¶ 150. Ellis stated:

> The maintenance is based on what [sic] *our cost to replenish both*
> *rate and reserves*, and so a good way to think about it is really kind
> of a developed cost basis . . . [I]t's a project specific calculation.
> We take our best inventory and that goes into our maintenance
> program. It's what you would do if all you were going to do as a
> company was spend maintenance, you are going to high-grade
> your program and spend – do your best projects. And that is what
> drives our maintenance program.

*Id.* (emphasis added). In other words, Ellis reiterated that maintenance capex represents the

capital expenditures that are used to restore production at its most promising drilling facilities.

LINN's 2009 10-K identified another type of "maintenance" expense that was not

classified as a capital expenditure. In its discussion of "Oil and Natural Gas Properties," LINN

stated: "Expenditures for maintenance and repairs necessary to maintain properties in operating

condition are expensed as incurred." 2009 10-K at 60, 74. These maintenance expenses were

reflected on LINN's income statement in the line item "lease operating expenses" ("LOE"). *Id.*

at 70. LINN disclosed that LOE included "expenses such as labor, field office, vehicle,

supervision, *maintenance*, tools and supplies and workover expenses." *Id.* at 47 (emphasis

added). LOE is deducted in calculating LINN's net income.

Thus, LINN's financial disclosures on the first day of the Class Period described two

different types of "maintenance" expenditures: (1) capital expenditures used to upgrade existing

facilities in order to restore production (maintenance capex), and (2) property maintenance and repair expenses (LOE).

LINN made similar disclosures regarding both types of maintenance expenditures throughout the Class Period. *See* Compl. at ¶ 150; 4/29/2010 8-K Ex. 99 at 1; 2010 10-K at 42, 43, 74; 2/24/2011 8-K at 3; 2011 10-K at 44, 62; 2/23/2012 8-K Ex. 99 at 4; 2012 10-K at 41, 61; 2/21/2013 8-K Ex. 99 at 5; 1Q 2013 10-Q at 24; 2Q 2013 10-Q at 27, 43.

Plaintiffs allege that LINN "understated" its maintenance capex by excluding the maintenance expenses that were categorized as LOE from that figure. Because maintenance capex is subtracted from adjusted EBITDA when calculating DCF, Plaintiffs assert that the understatement of maintenance capex led to an overstatement of DCF, which materially misled investors about LINN's ability to continue making distributions to unitholders. *See* Compl. at ¶¶ 9, 93.

## IV.   LinnCo's Offering Documents

Between June 25 and October 11, 2012, LinnCo filed the offering documents related to its IPO, including its original Form S-1 registration statement ("Registration Statement"), several amendments to the Registration Statement, and the prospectus (collectively, the "Offering Documents"). *See id.* at ¶ 81. On October 12, 2012, LinnCo completed its IPO. *See id.* at ¶ 4. Because LinnCo's sole purpose is to own LINN units, LinnCo's Offering Documents incorporated LINN's financial statements and referenced LINN's recent Form 10-Ks. *See* 10/1/2012 S-1/A at F-13; 10/10/2012 S-1/A at II-14. They also repeated some of the information regarding LINN's non-GAAP financial measures. *See id.* at 86-87, 116; Compl. at ¶¶ 84-89.

LinnCo incorporated LINN's financial statements into its subsequent SEC filings during the Class Period. *See id.* at ¶ 5.

## V.     2013 "Revelations"

### A.     Financial Analyst Articles

According to Plaintiffs, beginning in February 2013, information that LINN had been

concealing from the public began to "emerge in the market." *Id.* at 78. Financial analysts started

paying closer attention to LINN's method of calculating DCF.

On February 16, 2013, Barron's magazine published an article titled "Drilling Into the

Numbers," in which the author, Andrew Bary, demonstrated his in-depth understanding of

LINN's financial statements. Bary opined: "Linn may be overstating the cash flow available for

distribution, by not deducting the cost of financial derivatives—mainly put options—from its

realized gains on hedging activities in its quarterly results." *Id.* at ¶ 197. Noting that LINN

"spent $583 million on derivatives purchases in the first nine months of 2012," Bary then

explained:

> Linn expenses the cost of puts and other derivatives over a
> multiyear period when calculating net income, as mandated by
> accounting rules. *But it doesn't deduct such costs from
> distributable cash flow*, a financial measure that isn't compiled in
> accordance with GAAP . . . This means companies have leeway in
> making the latter calculations. Usually, they subtract interest
> expense and maintenance capital expenditures from gross cash
> flow to derive the amount of cash available to be distributed to
> holders.

*Id.* (emphasis added). Thus, Bary recognized that, on its GAAP-compliant income statement,

LINN amortized (gradually expensed) its put premiums. He also understood that LINN did not

deduct those premiums in calculating its non-GAAP DCF.

Apparently, Bary just believed that LINN should have defined the non-GAAP DCF

metric differently—as deducting interest expense and maintenance capex from "gross cash flow"

instead of "adjusted EBITDA." Bary emphasized that his proposed alternative method of

27

calculating DCF would include a deduction for put premiums, while LINN's calculation of DCF, which begins with adjusted EBITDA instead of net cash provided by operating activities, does not incorporate any deduction for put premiums.

The Barron's article did not accuse LINN of failing to adequately or accurately disclose how it treated derivatives or how it defined DCF. However, Bary noted that an analyst named David Amoss (of the Howard Weil firm) had just downgraded his rating of LINN's stock and reduced his estimate of LINN's DCF, "citing the company's treatment of its hedging costs." *Id.*

Plaintiffs point to several other articles written by financial analysts who examined LINN's financial disclosures and analyzed its method of calculating DCF. The authors of these articles concluded that LINN's DCF would be lower if LINN calculated it differently (*i.e.*, by also deducting put premiums). *See id.* at ¶¶ 213, 221. Yet other articles suggested that LINN could more accurately measure its cash flow by using a non-GAAP metric called "free cash flow" (which also does not have a uniform definition) instead of DCF. *See id.* at ¶¶ 209, 213. These authors all clearly understood exactly how LINN prepared its financial statements, and how it calculated DCF. *See id.* at ¶¶ 209, 213, 221.

Several of the articles cited by Plaintiffs in their Complaint acknowledged that LINN's disclosures did not violate either GAAP accounting rules or any applicable laws. Other Barron's pieces cited by Plaintiffs recognized that LINN's accounting practices are "legal" and that the company "has leeway in computing DCF because the measure isn't governed by [GAAP]." Andrew Bary, *Linn Comes Clean on Derivatives Costs*, BARRON'S, June 15, 2013, http://online.barrons.com/article/ SB50001424052748704878904578541271968688436.html (last visited July 7, 2014); Andrew Bary, *Twilight of a Stock-Market Darling*, BARRON'S, May 4, 2013, http://online.barrons.com/news/articles/SB50001424052748703591404578456911

269145042 (last visited July 7, 2014). Barron's specifically commented that LINN's net income was "GAAP-compliant" and that the "put expense is properly reflected in Linn's GAAP financials." *Id.*

In a Hedgeye article cited by Plaintiffs, a section that the Plaintiffs chose not to quote stated: "We do not mean to imply that there is anything improper about what [LINN] is doing." Hedgeye Risk Management, *Looking at Linn Energy*, March 25, 2013, http://app.hedgeye.com/unlocked_content/27487-looking-at-linn-energy (last visited July 7, 2014).

The Complaint cites another Hedgeye article that questioned the accuracy of LINN's reported maintenance capex, speculating that it "understate[d] the actual costs of [] the business." *See* Compl. at ¶ 213.

**B.    LINN's 2013 Disclosures**

Plaintiffs assert that LINN and LinnCo, in response to these articles, made "belated" disclosures that "implicitly acknowledg[ed] that [their] previous statements and financial results were materially false or misleading." Pl. Opp. to LINN at 12.

On April 1, 2013, LINN and LinnCo issued a press release announcing that LINN had published a presentation on its website, titled "LINN Energy Response to Another Round of Short Seller Comments." Compl. at ¶ 210. In the presentation, LINN first addressed its "Cash flow from operating activities," explaining: "In accordance with GAAP, premiums paid for derivatives are included in cash flow from operating activities." *Id.* It further stated: "Historical GAAP cash flow from operating activities was sufficient to cover the distribution with only one material reconciling item, premiums paid for derivatives, in calculating the non-GAAP financial metric of distributable cash flow ('DCF')." *Id.* These statements mirrored LINN's previous

disclosures that its GAAP net cash provided by operating activities included a deduction for the premiums paid to purchase derivatives, but that its calculation of DCF did not.

With respect to its ability to generate sufficient cash flow to cover its projected distributions, LINN stated: "LINN has not purchased any puts in 2013 and currently has no plans to do so. If it does not buy additional puts, GAAP cash flow from operating activities is expected to support LINN's distribution and the maintenance portion of its development capital expenditures ('maintenance capex') going forward." *Id.*

Second, LINN's press release explained the difference between "maintenance capex" and LINN's non-capital maintenance expenses:

> Maintenance capex alone understates the amount of money LINN spends on maintenance activities. Maintenance activities are not all "capital" and certain maintenance activities are included in lease operating expenses ("LOE"). From 2009 to 2012, maintenance activities included in LOE totaled $174 million, which if included in maintenance capex would have increased that metric by 24%.

*Id.* These comments echoed LINN's previous disclosures, which identified the two separate categories of "maintenance" expenditures.

Shortly thereafter, on April 25, 2013, LINN announced "disappointing results" for 1Q 2013 and "reveal[ed], for the first time during the Class Period, that LINN's cash flows were insufficient to cover its declared quarterly distribution (which, for the quarter, was $0.725 per unit)." *Id.* at ¶ 214. LINN reported DCF of $0.64 per unit and a distribution coverage ratio of 0.88x for the quarter; this was "below LINN's earlier guidance of a distribution coverage ratio of 0.97x and DCF per unit of $0.70 for the quarter." *Id.*

Although LINN's distribution coverage ratio was below 1.0, LINN still paid the declared distribution to unitholders in full. Plaintiffs contend that LINN must have paid its distributions

from cash raised through debt and equity offerings instead of from cash generated by operations, because DCF per unit was less than the distributions per unit. *Id.* at ¶¶ 13, 74.

Defendant Ellis attributed the 1Q 2013 results to a "challenging operating environment" and expressed optimism about LINN's ability to "steadily increase its distribution coverage ratio throughout the year." *Id.* at ¶ 215. Plaintiffs do not allege that the shortfall was in any way related to premiums paid for put options; in fact, LINN did not pay any premiums to purchase put options during 1Q 2013. *See* 1Q 2013 10-Q at 4.

On June 3, 2013, LINN and LinnCo filed an amended registration statement in connection with the proposed acquisition of a company named Berry Petroleum Company ("Berry"). *See* Compl. at ¶ 224. Like LINN's previous filings, the registration statement included a cash flow statement that disclosed the premiums LINN had paid to purchase derivatives during the most recent period. *See* 6/3/2013 S-1/A at FIN-26. The registration statement also included the figure that Plaintiffs claim LINN should have deducted in its calculations of DCF—the premiums previously paid for put options that settled during each reporting period:

> The premiums paid for put options *that settled* during the three months ended March 31, 2013 and March 31, 2012 and during the years ended December 31, 2012, 2011 and 2010 were approximately $43 million, $26 million, $148 million, $88 million and $94 million, respectively.

*Id.* at 257 (emphasis added). In disclosing this figure, LINN did not change the definition of either adjusted EBITDA or DCF to include a deduction for the premiums paid for settled put options; it simply added information about settled put options to its prior disclosures.

On July 1, 2013, LINN disclosed that the SEC had begun an informal inquiry into LINN's hedging strategy and its use of non-GAAP measures. *See* Compl. at ¶ 227. The press

31

release also stated: "The SEC has stated that the fact of the inquiry should not be construed as an indication that the SEC or its staff has a negative view of any entity, individual or security." *Id.* Plaintiffs attach considerable significance to this investigation; however, they do not allege that the SEC has brought any charges against LINN, or that the Commission has concluded that either its GAAP accounting or its use of non-GAAP measures was wrongful.

On August 8, 2013, LINN released its 2Q 2013 10-Q. Plaintiffs allege that LINN again had "disappointing financial results" for the quarter, since it "reported a distribution coverage ratio of only 0.89x and DCF per unit of $0.65, well below its earlier guidance of a distribution coverage ratio of 1.00x distribution coverage ratio and DCF per unit of $0.72 for the quarter." *Id.* at ¶ 229. The "Risk Factors" section of the 2Q 2013 10-Q acknowledged the potential effect of cash flow shortages on future distributions:

> For the quarters ended March 31, 2013, and June 30, 2013, our distributable cash flow was less than cash distributions to our unitholders. While the Board of Directors considers estimates of distributable cash flow both historically and prospectively when declaring a distribution for the current period, if we continue to generate distributable cash flow that is insufficient to maintain our current distribution to unitholders, our Board of Directors may determine to reduce or eliminate our distribution to unitholders.

2Q 2013 10-Q at 49. LINN then discussed risk factors that could cause distributions to decline, including production from existing assets, commodity prices, and cost of capital. *See id.*

As in previous financial statements, LINN disclosed the premiums paid to purchase derivatives during the period on its 2Q 2013 cash flow statement. *See id.* at 44. For a second consecutive quarter, LINN also disclosed the amount of premiums previously paid for the put options that settled during the period:

> The premiums paid for put options that settled during the three months ended June 30, 2013, and June 30, 2012, and during the six months ended June 30, 2013, and June 30, 2012, were

32

> approximately $43 million, $36 million, $86 million and $62
> million, respectively.

*Id.* at 42. LINN went on to explain that it did not deduct the premiums paid out for put options

in previous periods—even if those put options settled during the period—because those

premiums had no cash impact in the period during which the options settled:

> Deducting the premiums paid for put options would reduce the
> Company's adjusted EBITDA and DCF; however, the Company
> pays cash for put options at the time of execution and no additional
> amounts are payable in the future under the contracts. Therefore,
> the Company's calculation of adjusted EBITDA and DCF is more
> representative of the cash available for distribution during the
> period.

*Id.*

Plaintiffs treat this disclosure as an admission that LINN had been overstating DCF all

along, since LINN acknowledged: "Deducting the premiums paid for put options would reduce

the Company's adjusted EBITDA and DCF." *See id.*; Pl. Opp. to LINN at 14.

Finally, in its 2Q 2013 10-Q, LINN disclosed that it was changing its definition of DCF

to include an additional deduction. The new definition of DCF was as follows: DCF = Adjusted

EBITDA – Interest expense – Maintenance capital expenditures – Provision for legal matters.

*See* 2Q 2013 10-Q at 42. The new "Provision for legal matters" deduction in the DCF

calculation was zero for the quarter. *See id.*

On September 17, 2013 (the last day of the Class Period), LINN and LinnCo filed a

fourth amendment to the registration statement related to the Berry merger. Plaintiffs allege that,

in this amendment, LINN "announced significant revisions to its accounting for and use of

adjusted EBITDA, DCF, and maintenance capex." Compl. at ¶ 238. In the amendment, LINN's

"Explanatory Note Regarding Non-GAAP Financial Measures and Distribution Practices" stated:

> Historically, LINN's management has recommended, and the
> LINN board of directors has made a determination regarding, the
> appropriate level of cash distributions to unitholders by starting
> with "Adjusted EBITDA," which previously included adjustments
> for cash flows from acquisitions and divestitures between the
> effective date and the closing date and did not deduct premiums
> paid for put options, and deducting interest expense, "maintenance
> capital expenditures" and provision for legal matters.

*Id.* LINN then described its new "methodology for evaluating distributions" going forward. *Id.*

First, LINN made changes to its definition of adjusted EBITDA. The company disclosed

that this figure would "no longer include adjustments for cash flows from acquisitions and

divestitures between the effective date and the closing date and [would] *deduct the premiums*

*paid for put options that settled during the period.*" *Id.* (emphasis added). In other words, LINN

chose to start calculating adjusted EBITDA in the way that Plaintiffs claim it should have

calculated it all along; it began deducting the premiums paid for settled derivatives.

Second, LINN altered its approach to determining distributions: "Adjusted EBITDA will

no longer be the starting point for explaining LINN's management's recommendation of and the

LINN board of directors' determination of the appropriate level of cash distributions to

unitholders." *Id.* LINN also declared that it would "no longer use[] the term 'distributable cash

flow.'" *Id.* Instead, LINN stated, it would "start[] with net cash provided by (used in) operating

activities as determined in accordance with GAAP and as set forth on LINN's statement of cash

flows." *Id.*

Third, LINN announced that it would "discontinue the use of the term 'maintenance

capital expenditures' and, instead, use the term 'discretionary reductions for a portion of oil and

natural gas development costs.'" *Id.* It did not, however, alter the method used to calculate this

metric.

34

Plaintiffs assert that, by making these revisions to its non-GAAP financial disclosures, LINN and LinnCo "effectively conced[ed] that the non-GAAP financial measures [they] had previously reported on were indeed misleading." *Id.*

Plaintiffs contend that the market reacted "swiftly" to LINN's 2013 revelations. Pl. Opp. to LINN at 9. In the seven months between February 15, 2013 and September 18, 2013, the price of LINN units fell by approximately 25%, and the price of LinnCo shares fell by approximately 18%. *See* Compl. at ¶¶ 197, 214, 221, 225, 228, 236, 238.

## VI.    Plaintiffs' Claims

Plaintiffs assert that, throughout the Class Period, LINN made material misstatements or omissions by: (1) reporting a DCF that was too high, (2) reporting a distribution coverage ratio that was too high, and (3) reporting a maintenance capex (an element of the DCF calculation) that was too low.[15] *See id.* at ¶ 93. Plaintiffs argue that these erroneous reports misled investors about LINN's ability to pay distributions to its unitholders.

Plaintiffs acknowledge that LINN disclosed the upfront premiums it paid for put options on its periodic cash flow statements, but Plaintiffs contend that premiums paid during any particular period "were irrelevant to LINN's quarterly and yearly non-GAAP *DCF* calculations." Pl. Opp. to LINN at 3 (emphasis in original). Plaintiffs argue that LINN's financials were materially misleading because they "failed to disclose" that DCF and the distribution coverage ratio "excluded the significant cost of settled put options it purchased as part of its hedging strategy, but included the proceeds it received from the sale or exercise of those options." Compl. at ¶ 8; *see also* Pl. Opp. to LINN at 3.

---

[15] As discussed above, Plaintiffs abandoned their argument that LINN made misstatements or omissions regarding its calculation of adjusted EBITDA. *See* Pl. Opp. to LINN at 2, 13.

Plaintiffs further assert that LINN's misleading disclosures about these non-GAAP metrics violated two SEC regulations: Regulation G and Item 10(e) of Regulation S-K.

Finally, because LinnCo's Offering Documents and other SEC filings incorporated LINN's filings and repeated some of the statements regarding LINN's performance, Plaintiffs contend that LinnCo's statements were materially misleading for the same reasons that LINN's disclosures were misleading.

Based on these purported material misstatements and omissions in LINN's and LinnCo's financial disclosure documents and public statements, Plaintiffs assert five causes of action.

Count I arises under Section 11 of the Securities Act, which prohibits material misstatements or omissions in registration statements filed with the SEC. *See* Compl. at ¶¶ 272-82; 15 U.S.C. § 77k(a). The Defendants on Count I include LinnCo, the Individual Defendants, and the Underwriter Defendants.

Count II arises under Section 15 of the Securities Act, which is the Act's provision for "control-person liability." *See* Compl. at ¶¶ 283-87; 15 U.S.C. § 77o. It identifies Defendant LINN and the Individual Defendants as control persons of LinnCo. *See* Compl. at ¶¶ 286-87.

Count III arises under Section 12(a)(2) of the Securities Act, which prohibits material misstatements or omissions in prospectuses or oral communications used in selling securities. *See id.* at ¶¶ 288-97; 15 U.S.C. § 77l(a)(2). The Defendants on Count II are the Underwriter Defendants. *See* Compl. at ¶ 94.

Count IV arises under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and seeks to impose primary liability for material misstatements or omissions on LINN, LinnCo, and the Individual Defendants. *See id.* at ¶¶ 298-302.

36

Count V arises under Section 20(a) of the Exchange Act; it alleges that the Individual

Defendants are liable for the primary securities fraud violations committed by LINN and/or

LinnCo as "control persons." *See id.* at ¶¶ 303-308.

The Defendants have moved to dismiss all claims pursuant to Federal Rules of Civil

Procedure 8(a), 9(b), and 12(b)(6), and the PSLRA.

The motion is granted.

## DISCUSSION

### I. Standard of Review

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must liberally

construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable

inferences in favor of the plaintiff. *See Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44 (2d

Cir. 2003); *see also Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007).

However, to survive a motion to dismiss, "a complaint must contain sufficient factual

matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing

*Twombly*, 550 U.S. at 556). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss

does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations,

citations, and alterations omitted). Thus, unless a plaintiff's well-pleaded allegations have

37

"nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Id.* at 570; *see also Iqbal*, 556 U.S. at 680.

While factual allegations should be construed in the light most favorable to the plaintiffs, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* at 678.

This liberal pleading standard is modified by Federal Rule of Civil Procedure 9(b), which requires a plaintiff asserting fraud claims to meet a heightened pleading standard. While Rule 8(a) usually requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a), a plaintiff asserting fraud must "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). Rule 9(b) applies to claims brought pursuant to the Exchange Act and to claims brought pursuant to the Securities Act which likewise "sound in fraud." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).

In addition, the PSLRA requires application of a heightened pleading standard to claims brought under the Exchange Act. *See* 15 U.S.C. § 78u-4. Under the PSLRA, a plaintiff must "specify each statement [or omission] alleged to have been misleading [and] the reason or reasons why the statement is misleading . . ." and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* §§ 78u-4(b)(1)(B) and (b)(2)(A).

In deciding a motion to dismiss, a court may consider the full text of documents that are quoted in or attached to the complaint, or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit. *See Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000) (citing *Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991)); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir.

38

1996). In this case, that includes all of the 10-Ks, 10-Qs, and public statements that allegedly contained misstatements or omissions.

## II.     The Complaint Must Be Dismissed.

### A.     Plaintiffs Fail to Allege Any Actionable Misstatement or Omission.

Because Plaintiffs have failed to plead any misstatement or omission, even under the liberal Rule 8(a) standard, all their claims must be dismissed.

Sections 11, 12(a)(2), and 15 of the Securities Act "impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material *misstatements* or *omissions*." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010) (emphasis added). Section 11 applies to registration statements, and Section 12(a)(2) applies to prospectuses and oral communications. *See id.*; 15 U.S.C. §§ 77k(a), 77l(a)(2).

Section 15 establishes "control-person liability" under the Securities Act—liability for individuals or entities that "control[ ] any person liable" under Section 11 or 12. *Id.* § 77o. However, a plaintiff must first demonstrate "primary" liability under either Section 11 or 12 before he can establish control-person liability under Section 15. *See In re Morgan Stanley*, 592 F.3d at 358, 366.

Plaintiffs also bring claims for securities fraud under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78a, *et seq.* To state a claim under Section 10(b), and the accompanying regulation Rule 10b-5, a plaintiff must allege that defendants (1) made *misstatements or omissions of material fact*, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's

39

reliance was the proximate cause of its injury. *See Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

Section 20(a) of the Exchange Act establishes "control-person liability"—liability for persons who, directly or indirectly, control a person liable under any provision of the Act. *See* 15 U.S.C. § 78t(a). Plaintiffs must demonstrate primary liability under Section 10(b) and Rule 10b-5 before they can prove control-person liability. *See Hutchins v. NBTY, Inc.*, No. 10 Civ. 2159 (LDW)(WDW), 2012 WL 1078823, at *5 (E.D.N.Y. Mar. 30, 2012).

The necessary predicate to any action under the securities laws is either (1) making a "misstatement" or (2) omitting to say something that is needed in order for the full truth to be told. A "misstatement" is a statement that is not true. If a company tells the truth in its public filings and in its communications to analysts and the public, there is no need to worry about issues like scienter and materiality—truth is an absolute defense to any action under the securities laws.

The detailed factual recital set forth above makes it perfectly clear that, at all times, LINN and LinnCo told the whole truth and nothing but about how they were calculating adjusted EBITDA, DCF, the distribution coverage ratio, and maintenance capex—all non-GAAP metrics for which there is no "right" formula because, unlike GAAP metrics, they have no uniform definition. Plaintiffs take issue with the way LINN chose to calculate these metrics, but that is of no moment. It is not fraudulent for a reporting entity to calculate metrics that are not defined under GAAP (like the ones at issue here), taking (or not taking) into account whatever factors the reporting entity thinks appropriate—as long as the public is told exactly what the company is doing. *See In re Netflix, Inc. Sec. Litig.*, No. 04 Civ. 2978, 2005 WL 3096209, at *11 (N.D. Cal. Nov. 18, 2005). On the *facts* here pleaded (as opposed to the wholly conclusory assertions that

"misstatements" were made), Plaintiffs are unable to identify a single instance in which LINN's disclosures of how it calculated adjusted EBITDA, DCF, the distribution coverage ratio, or maintenance capex were incorrect.

It is true that, in 2013, LINN was criticized in the financial press for calculating certain metrics as it did. Apparently in response to that criticism—which was leveled together with the writers' admission that the company was doing *nothing wrong under the law*—LINN ultimately decided to change some of its formulas. Plaintiffs' effort to transform that business decision into some sort of admission that statements made in prior reporting periods were false and materially misleading is entirely misguided. Absent a misstatement, there can be no fraud.

Of course, companies can also violate the securities laws by omitting to state something that is necessary to prevent a technically true statement in their disclosures from being "misleading." *In re Lehman Bros. Sec. and Erisa Litig.*, 799 F. Supp. 2d 258, 275 (S.D.N.Y. 2011); *see also In re Morgan Stanley*, 592 F.3d at 360-66. But the Complaint alleges no such omission.

While Plaintiffs assert that LINN "failed to disclose" that DCF did not incorporate a deduction for settled put premiums, they are simply wrong. Plaintiffs admit that LINN disclosed detailed formulas for calculating both adjusted EBITDA and DCF (which was derived from adjusted EBITDA). *See* Compl. at ¶¶ 8, 85-88, 93, 96. It is perfectly apparent from reading these formulas that, when calculating DCF for any particular quarter, LINN did not deduct the premiums it previously paid for the puts it settled during that quarter. LINN did not "omit" this information from its filings; it would have been clear to anyone who actually read the disclosure statements.

Plaintiffs' argument about the "proper" method of calculating DCF makes little sense where, as here, there is no recognized "proper" method of making such calculation. But it is also a demonstrably flawed argument. Plaintiffs note that DCF is a measure of cash flow, yet they contend that cash outlays made in previous periods (*i.e.*, settled put premiums) should be deducted (from what they do not specify) in a period in which the cash is not paid out. Plaintiffs reason that this "actual DCF" figure would allow them to better gauge the *profitability* of the settled put options. *See* Pl. Opp. to Underwriters at 6. But cash flow is not a measure of profitability—it is a measure of how much cash a company pays out or takes in during a period. As LINN explained in its 2Q 2013 10-Q, the premiums paid out in previous periods have no impact on a company's cash flow during the current period. *See* 2Q 2013 10-Q at 42. In short, Plaintiffs are conflating cash flow measures and profitability measures. Deducting the premiums paid for settled put options would not make LINN's DCF a more accurate reflection of its cash flow or its ability to pay distributions.

Plaintiffs also argue that LINN "understated" maintenance capex, which caused LINN to "overstate" DCF (since maintenance capex is deducted in the DCF computation). Compl. at ¶ 93.

The only fact that Plaintiffs cite for this conclusory assertion is the statements LINN made in its April 1, 2013 presentation:

> Maintenance capex alone *understates* the amount of money LINN spends on maintenance activities. Maintenance activities are not all "capital" and certain maintenance activities are included in lease operating expenses ("LOE"). From 2009 to 2012, maintenance activities included in LOE totaled $174 million, which if included in maintenance capex would have increased that metric by 24%.

*Id.* at ¶ 210 (emphasis added). Plaintiffs treat this as an admission that LINN had been "understating" maintenance capex all along.

Once again, the argument is wrong as a matter of pleaded fact.

From the beginning of the Class Period, LINN clearly disclosed that it made two different types of maintenance expenditures: (1) maintenance capital expenditures to upgrade facilities and restore production, *see* 2/25/2010 8-K Ex. 99 at 1, and (2) maintenance repair expenditures to "maintain properties in operating condition" (*i.e.*, the maintenance expenses included in LOE). 2009 10-K at 60. The former are capital expenditures; the latter are operating expenditures. "Maintenance capex" is shorthand for "maintenance capital expenditures." As a measure of capital expenditures, maintenance capex should not include any operating (*i.e.*, non-capital) expenditures; and because it is only a measure of capitalizable maintenance expenditures, the metric necessarily does not include every maintenance expenditure the company made. The statement cited by Plaintiffs is not a misstatement—it is literally true; it omits nothing; and it explains everything quite clearly.

Plaintiffs also argue that LINN's method of calculating maintenance capex was materially misleading because it caused LINN to overstate DCF. They reason that, because maintenance capex failed to account for LOE maintenance costs, subtracting only capital maintenance costs from adjusted EBITDA led to an overstatement of DCF. *See* Compl. at ¶ 93; Pl. Opp. to LINN at 11-12.

But, as explained above, LOE maintenance costs did factor into the calculation of DCF. "Income from continuing operations" incorporates a deduction for LOE maintenance expenses, and LINN calculates DCF by adding and subtracting various expenses from income from continuing operations.[16] What Plaintiffs seem to want is for LINN to deduct LOE maintenance expenses twice. *That* would be misleading.

---

[16] Adjusted EBITDA = Income from continuing operations + 13 adjusting items
DCF = Adjusted EBITDA − Interest expense − Maintenance capex

43

In the end, Plaintiffs are really arguing that there were better ways for LINN to calculate its non-GAAP metrics—ways that would have more accurately forecast the decline in available cash that occurred during 2013. They may well be correct about that. But the federal securities laws do not protect the marketplace from flawed business decisions, which is what choosing to calculate a metric in a particular way is where, as here, there is no settled formula. The securities laws prohibit only the telling of untruths and the concealment of information necessary to prevent other disclosures from being materially misleading. Here, no untrue statements were uttered and nothing was concealed or omitted—at all times, LINN and LinnCo told the truth about how it chose to calculate adjusted EBITDA, DCF, the distribution ratio, and maintenance capex. Plaintiffs fail to plead any violation of the Securities Act or the Exchange Act.

## B.      Plaintiffs Fail to Allege Any Violation of SEC Regulations.

An SEC regulation can provide an independent basis upon which to hold a defendant liable under the securities laws, as long as the regulation imposes an "affirmative legal disclosure obligation." *Lehman Bros.*, 799 F. Supp. 2d at 275.

Plaintiffs assert that LINN and LinnCo's DCF disclosures violated two SEC regulations: (1) Regulation G and (2) Item 10(e) of Regulation S-K.

### 1.  Regulation G

Regulation G has two requirements: (1) a general disclosure requirement and (2) a reconciliation requirement.

The general disclosure requirement prohibits registrants from "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order

to make the presentation of the non-GAAP financial measure . . . not misleading." SEC Release No. 33-8176, 2003 WL 161117, at *6.

The reconciliation requirement requires a registrant that chooses to disclose a non-GAAP measure to provide the following information: (a) a presentation of the "most directly comparable" GAAP measure, and (b) a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. *Id.*

Plaintiffs argue that LINN's disclosures of DCF (a non-GAAP measure) violated both requirements of Regulation G and, thus, violated the securities laws. *See* Compl. at ¶¶ 14-15, 64, 69, 76. They are wrong, for two reasons.

First, SEC regulations explicitly provide that a violation of Regulation G does not constitute an independent basis for liability under the securities laws. *See* 17 C.F.R. § 244.102.

Second, LINN did not violate Regulation G.

Plaintiffs argue that LINN violated the general disclosure requirement because LINN's DCF disclosures were "misleading" insofar as they did not include a deduction for the premiums paid for settled put options. *See* Compl. at ¶ 15; SEC Release No. 33-8176, 2003 WL 161117, at *6. As discussed above, LINN's *disclosures* relating to DCF were not misleading. LINN explained how it calculated this non-GAAP metric; the public was not deceived about the methodology it used.

Plaintiffs also assert that LINN violated Regulation G's reconciliation requirement. Yet they acknowledge that LINN's disclosures reconciled DCF with net income, since LINN first reconciled adjusted EBITDA with net income and then derived DCF from adjusted EBITDA. Plaintiffs contend that LINN should have instead used net cash provided by operating activities

as the "starting point" for its DCF computation, since that is the "most directly comparable" GAAP measure. Compl. at ¶ 77. In other words, Plaintiffs argue that LINN should have used a different GAAP metric as a comparator.

However, in the SEC release setting forth Regulation G's requirements, the SEC expressly declined to provide a specific definition of the term "most directly comparable," stating: "We believe that it is most appropriate to provide registrants with the *flexibility* to best make the determination as to which is the 'most directly comparable financial measure calculated and presented in accordance with GAAP.'" SEC Release No. 33-8176, 2003 WL 161117, at *6 n.26 (emphasis added). The SEC gave the following "general guidance:"

> [W]e note that our staff has been, and continues to be, of the view that (1) non-GAAP financial measures that measure *cash* or "funds" generated from operations (liquidity) should be balanced with disclosure of amounts from the statement of cash flows (cash flows from operating, investing and financing activities); and (2) non-GAAP financial measures that depict *performance* should be balanced with net income, or income from continuing operations, taken from the statement of operations.

*Id.* (emphasis added). So generally, non-GAAP "cash" measures should be reconciled with GAAP cash flow from operations (from the cash flow statement), and non-GAAP "performance" measures should be reconciled with GAAP net income or income from continuing operations (from the income statement). *Id.*

In its SEC filings, LINN described adjusted EBITDA as both a "cash flow" measure and a "performance" measure. 2009 10-K at 35, 39; 2/25/2010 8-K Ex. 99 at 3. Given the SEC's grant of "flexibility" to registrants to determine the "most directly comparable" GAAP measure, LINN could easily justify reconciling adjusted EBITDA with either GAAP cash flow measures (like net cash provided by continuing operations) or GAAP performance measures (like net income or income from continuing operations) prior to deriving DCF.

Furthermore, LINN reconciled adjusted EBITDA with both types of GAAP measures. The company's periodic filings contained schedules reconciling adjusted EBITDA to a GAAP performance measure (either income from continuing operations or net income).[17] *See* 2009 10-K at 57; 2010 10-K at 58; 2011 10-K at 59; 2012 10-K at 58. LINN also provided narratives setting forth clear reconciliations between adjusted EBITDA and net cash provided by operating activities (a GAAP cash flow measure):

> Net cash provided by operating activities for the year ended December 31, 2009, was approximately $426.8 million and includes cash interest payments of approximately $73.9 million, premiums paid for commodity derivatives of approximately $93.6 million, cash settlements on interest rate derivatives of approximately $41.7 million, realized gains on canceled derivatives of approximately $(49.0) million and other items of approximately $(20.8) million that are not included in adjusted EBITDA.

2009 10-K at 57; *see also* 2010 10-K at 58; 2011 10-K at 59. Since Regulation G allows a reconciliation to be provided "by schedule or *other clearly understandable method*," a paragraph enumerating the reconciling items is on its face compliant with the regulation. SEC Release No. 33-8176, 2003 WL 161117, at *6 (emphasis added).

After reconciling adjusted EBITDA with both types of GAAP measures, LINN set forth schedules deriving DCF from adjusted EBITDA. *See* Compl. at ¶¶ 132, 141, 152, 160, 168, 177, 184, 193, 205, 219; 2/25/2010 8-K Ex. 99 at 14; 4/29/2010 8-K Ex. 99 at 13; 7/29/2010 8-K Ex. 99 at 12; 2Q 2013 10-Q at 41-42. LINN's disclosures thus demonstrated how to reconcile DCF with both GAAP cash flow measures and performance measures.

---

[17] As discussed above, in earlier reporting periods during the Class Period, LINN reconciled adjusted EBITDA to income from continuing operations. *See* 2009 10-K at 57; 2010 10-K at 58; 2011 10-K at 59. In later periods, LINN started reconciling adjusted EBITDA to net income instead. *See* 2012 10-K at 57-58; 1Q 2013 10-Q at 29-30; 2Q 2013 10-Q at 42. This difference does not matter for purposes of Regulation G, since both net income and income from continuing operations are "performance" measures, as opposed to "cash" measures. SEC Release No. 33-8176, 2003 WL 161117, at *6 n.26.

Plaintiffs' argument that LINN violated Regulation G by failing to reconcile adjusted EBITDA to a GAAP cash flow measure prior to deriving DCF has no merit; LINN reconciled adjusted EBITDA with both GAAP cash flow measures and performance measures. Moreover, as LINN had "flexibility" to determine which GAAP measure was "most directly comparable," LINN's DCF disclosures complied with Regulation G. SEC Release No. 33-8176, 2003 WL 161117, at *6 n.26.

### 2.   Item 10(e) of Regulation S-K

Item 10(e) of Regulation S-K sets forth requirements for non-GAAP financial disclosures that are similar to those of Regulation G. First, Item 10(e) contains the same reconciliation requirement—a registrant must reconcile a non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 229.10(e)(1)(i); SEC Release No. 33-8176, 2003 WL 161117, at *8. As discussed above, LINN complied with this requirement. *See supra* at § II.B.1.

In addition, Item 10(e) prohibits a registrant from "[e]xclud[ing] *charges or liabilities that required, or will require, cash settlement*, or would have required cash settlement absent an ability to settle in another manner, from non-GAAP liquidity measures, other than the measures earnings before interest and taxes (EBIT) and earnings before interest, taxes, depreciation, and amortization (EBITDA)."[18]  17 C.F.R. § 229.10(e)(1)(ii) (emphasis added); *see also* SEC Release No. 33-8176, 2003 WL 161117, at *8. Item 10(e) is designed to prevent a company from overstating the amount of cash it has or will have available by failing to disclose items that require a cash outlay. The regulation uses the word "required" as well as "will require," and

---

[18] In commentaries regarding Item 10(e), the SEC has made clear that, while EBIT and EBITDA are exempt from the prohibited exclusions provision of Item 10(e), *adjusted* EBITDA is not. *See* Frequently Asked Questions Regarding the Use of Non-GAAP Financial Measures, at Question 10 (June 13, 2003), http://www.sec.gov/divisions/corpfin/faqs/nongaapfaq.htm (last visited July 7, 2014). So LINN's adjusted EBITDA disclosures must comply with this provision.

Plaintiffs argue that this means that LINN violated the regulation by not including in its calculation of DCF premiums paid in prior reporting periods for put options that settled during the current period. *See* Compl. at ¶¶ 65-66; Pl. Opp. to LINN at 5-6, 11.

There is neither guidance from the SEC nor any case law discussing Item 10(e)'s use of the past tense "required," but the interpretation that Plaintiffs place on the word makes absolutely no sense. Item 10(e) by its terms relates to "non-GAAP *liquidity measures* other than" EBIT and EBITDA. 17 C.F.R. § 229.10(e) (emphasis added). (Adjusted EBITDA is not exempted from Item 10(e).) *Liquidity* has nothing to do with what occurred in the past. The idea behind the regulation is to inform the investing public if some portion of a company's current cash cannot be used for other purposes, because it is or will be needed to satisfy some pre-existing obligation. An expenditure of money years in the past cannot possibly have any impact on the company's liquidity position, either in the reporting period or in any period going forward—the cash is long gone, and the expenditure was reported in the period during which it was made, which is the period during which it has an impact on liquidity. Plaintiffs themselves acknowledge that "upfront payments of premiums constituted *one-time costs* related to puts spanning multiple years." Pl. Opp. to LINN at 13 (emphasis added). No additional cash outlay is required once the upfront premiums are paid, so deducting their cost again and again would actually mislead the public about the corporation's actual liquidity position.

LINN violated neither Regulation G nor Item 10(e) of Regulation S-K. Accordingly, neither regulation provides an independent basis upon which to conclude that LINN made a material misstatement or omission.

49

In sum, Plaintiffs have failed to allege any material misstatement or omission by LINN or LinnCo. Thus, Plaintiffs fail to allege an essential element of their claims for primary liability under Sections 11 and 12(a)(2) of the Securities Act (Counts I and III) and Section 10(b) of the Exchange Act (Count IV). These claims must be dismissed with prejudice. The Court need not address the Defendants' other arguments for dismissal.

Because Plaintiffs have failed to plead underlying primary violations, their control-person claims under Section 15 of the Securities Act (Count II) and Section 20(a) of the Exchange Act (Count V) likewise fail. They are dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, the Defendants' motions to dismiss are granted, and the Complaint is dismissed with prejudice. The Clerk of the Court is directed to remove Docket Nos. 37 and 39 from the Court's list of pending motions and to close the file.

Dated: July 7, 2014

_____

U.S.D.J.

BY ECF TO ALL COUNSEL

50